UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN ASHER, et al. | ) | |
| | ) | Hon. Blanche M. Manning |
| Plaintiffs, | ) | |
| v. | ) | Case Nos. 02 C 5608, 02 C 5742, 02 5807, |
| | ) | 02 C 6085, 02 C 6175, and 02 C 6267 |
| | ) | (Consolidated Proceedings) |
| BAXTER INTERNATIONAL, INC., et al.) | | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

Plaintiffs filed this proposed class action on behalf of shareholders who acquired stock in Defendant Baxter International, Inc. ("Baxter") between November 5, 2001 and July 17, 2002 ("the Class Period"). In the Amended Consolidated Class Action Complaint ("the Complaint"), Plaintiffs allege that Baxter and several of its key executives[1] (collectively, "the Baxter Defendants" or "Defendants") made materially false or misleading public statements ("the Public Statements")[2] in violation of section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and the Securities and Exchange Commission's Rule 10b-5 (17 C.F.R. §

---

[1] The key Baxter executives include: (1) Harry M. Jansen Kraemer, Jr., CEO and chairperson of the board of directors; (2) Brian P. Anderson ("B. Anderson"), CFO and senior vice president; (3) Norbert G. Reidel, vice president and chief scientific officer; (4) Karen J. May, vice president of human resources; (5) Eric Beard, vice president and president of European operations; (6) Thomas Sabatino, Jr., senior vice president and general counsel; (7) John Quick, vice president of quality and regulatory; (8) Gregory P. Young, vice president of Baxter Healthcare Corp.; (9) James M. Gatling, vice president of global operations; (10) Timothy B. Anderson ("T. Anderson") senior vice president of corporate strategy and development; and (11) James R. Hurley, vice president of integration management.

[2] The Public Statements include press releases, oral statements to the media, and SEC filings, which Defendants made during the Class Period.

240.10b-5).[3] The present matter comes before this Court on Defendants' Motion to Dismiss the Amended Class Action Complaint on the grounds that Plaintiffs have failed to allege facts supporting a "strong inference" that Defendants "actually knew" that the Public Statements were false or misleading, as required by 15 U.S.C. § 78u-5(c)(1)(B)(i). For the reasons that follow, the motion is DENIED.

## BACKGROUND[4]

Baxter is a diversified multinational healthcare company. It has three principal divisions: (1) the "Medication Delivery Division," which sells products used in the intravenous delivery of medication; (2) the "BioSciences Division," which markets pharmaceuticals, vaccines, and blood collection products and services; and (3) the "Renal Division," which offers products used to treat kidney diseases, such as dialysis machines and products.

Plaintiffs consist of two groups: (1) purchasers of Baxter stock on the open-market during the Class Period; and (2) former shareholders of Fusion Medical Technologies ("Fusion") who exchanged their shares of Fusion for stock in Baxter as part of Baxter's acquisition of Fusion on May 3, 2002.[5] Plaintiffs brought this action after Baxter's stock price dropped from $43 to $32 a share on July 18, 2002. This price drop, according to Plaintiffs, was the result of

---

[3] Defendants also allege control person liability under section 20(a) of the 1934 Act against Defendants Kraemer, B. Anderson, and Beard.

[4] The facts in the Background section are taken from the Complaint, this Court's July 17, 2003, Memorandum and Order (2003 WL 21825498) ("the 2003 Order"), granting Defendant's motion to dismiss the Original Complaint, and the Seventh Circuit's decision reversing the 2003 Order (Asher v. Baxter, 377 F.3d 727 (7th Cir. 2004)). Because the facts of this case are thoroughly discussed in this Court's prior order and the Seventh Circuit's decision, the Court will only address the facts as they relate to the issues currently before it.

[5] To complete its acquisition of Fusion, Baxter exchanged $157 million of its stock to the Fusion shareholders for their Fusion shares.

Baxter not meeting analysts' or Baxter's expectations in the second-quarter of 2002. Plaintiffs allege that during the Class Period Defendants made numerous misstatements and omissions about serious problems in Baxter's Renal and Biosciences Divisions. These misstatements, according to Plaintiffs, artificially inflated the share price of Baxter's stock.

## Alleged Misstatements and Omissions of Material Fact

Plaintiffs allege that before and during the Class Period, Baxter was facing numerous business and financial problems. One of the most pressing issues, confronting the Renal Division, arose shortly before the Class Period, in October of 2001, when it was discovered that dialysis filters, which Baxter produced and sold, were linked to the deaths of over 50 people. In an attempt to hide this and other problems during the Class Period, Defendants allegedly made the Public Statements to paint a false picture of Baxter's financial condition.

For example, on the first day of the Class Period, November 5, 2001, Baxter issued a press release stating that after conducting an investigation into the deaths of patients using one of its major dialysis products, Baxter would discontinue the product and take a charge of $100-$150 million. This press release, however, also contained what Baxter termed "our 2002 full-year commitments" ("the Commitments"), which stated that in 2002, it would "meet its 2002 full-year commitments of sales growth in the low-teens, earnings per share in the mid-teens and operational cash flow of at least $500 million." Shortly thereafter, on January 24, 2002, Baxter issued another press release reiterating the Commitments and predicting growth in sales in the BioSciences and Medication Delivery Divisions in the "mid-teens" and "in the high single-digits" in the Renal Division. For the rest of the Class Period, Baxter continued to publicly state that it was "on track to achieve" the Commitments.

3

Despite these rosy predictions, on the last day of the Class Period, Baxter released its actual second quarter 2002 financial results, which Plaintiffs contend revealed Baxter's "true financial condition." Instead of sales growing in the "low-teens," Baxter's sales grew by only 8%, which was $100 million less than predicted in the Commitments. These disappointing numbers were the result of: (1) the Renal Division's sales, which accounted for 25% of Baxter's total sales the previous year, being down 1%; and (2) the BioSciences Division's sales only growing at 7%. These numbers were well off the Commitments, which predicted growth in sales in the BioSciences Division in the "mid-teens" and "in the high single-digits" in the Renal Division. According to Plaintiffs, these results "shocked the market" resulting in an $11 drop in Baxter's stock price ($43 to $32) in one day.

Plaintiffs contend that the Public Statements, which included the Commitments, contained material misstatements and omissions because Defendants failed to disclose that: (1) Baxter was forced to close the plants where the defective dialysis products were manufactured, which left Baxter without any low-cost dialysis products, thereby exposing it to increased competition and the loss of customers and market-share; (2) economic instability in Latin America resulted in a drop in sales in that region; (3) a supply glut in blood-plasma products led to lower prices and revenues for the BioSciences Division, which also experienced manufacturing problems resulting in costs in excess of $10 million; and (4) overall demand for the BioSciences Division's products was waning.

Plaintiffs allege that Defendants knew of the above undisclosed problems and thus "had actual knowledge" that the Public Statements were misleading. In support of this contention, Plaintiffs allege that the Individual Defendants: (1) were top managers who had possession of

4

information which contradicted the Public Statements; and (2) had motivation not to reveal Baxter's actual financial situation so that: (a) Defendants could unload substantial portions of their Baxter stock at prices higher than if Baxter's true financial condition was made public; and (b) Baxter could acquire Fusion in a stock swap at a lower cost. Plaintiffs further allege that: (1) nine of the Individual Defendants sold off substantial portions of their Baxter stock during the Class period; and (2) Baxter's merger (via a stock swap) with Fusion was completed near the end of the Class Period.

During the Class Period, nine of the eleven Defendants sold 437,100 shares of Baxter stock, clearing $23,939,516 in total proceeds. As set forth in the chart below, Plaintiffs allege that these sales represented a dramatic increase when compared to Defendants' trading practices over the previous seven years.

| Defendant | Proceeds from Shares Sold During Class Period | As a Percent of Total Sales in the Last Seven Years |
|---|---|---|
| Reidel (VP/Chief Science Officer) | $4,345,854 | 100% |
| May (VP of Human Resources) | $1,859,254 | 88.84% |
| Beard (Pres. of European Operations) | $1,677,094 | 88.27% |
| Sabatino (VP/GC) | $1,234,750 | 58.37% |
| Quick (VP of Quality and Regulatory) | $8,830,0620 | 53.02% |
| Young (VP of Baxter Healthcare) | $506,318 | 52.79% |
| Gatling (VP of Global Mfg. Operations) | $535,800 | 36.28% |

5

| | | |
|---|---|---|
| B. Anderson (Senior VP of Corp. Strategy and Dev.) | $4,111,022 | 16.39% |
| Hurley (VP of Integration Management) | $836,800 | 12.42% |

Plaintiffs also allege that the Individual Defendants were top managers who had access to information which contradicted the Public Statements. According to Plaintiffs all Defendants were "hands-on managers" and "were directly involved in the day-to-day operations" at Baxter. As "high-level managers," Defendants "routinely accessed . . . Baxter's weekly (and even daily) revenue and financial reports via a computer system known internally at Baxter as the 'enterprise system,' which was a management information system developed by J.D. Edwards."

**Procedural History**

As a result of the above alleged misstatements and omissions and the drop in the share price of Baxter's stock, Plaintiffs filed their Initial Complaint on December 6, 2002. Count I alleged that Baxter and Defendants Kraemer and B. Anderson violated section 11 of the 1933 Act (15 U.S.C. § 77k) by issuing a registration statement with material misstatements and omissions of material facts. Count II alleged that all Defendants violated section 10(b) and Rule 10b-5 by making material misstatements and omissions of facts in Baxter's SEC filings, press releases, and oral statements to the media. Count III alleged that Defendants Kraemer and B. Anderson were "control persons" and therefore liable for the alleged misstatements and omissions.

In response to the Initial Complaint, Defendants moved to dismiss on the grounds that: (I) Plaintiffs failed to allege any misstatement or omission of material fact; (II) the alleged misstatements fell under the "safe harbor" provision of the Private Securities Litigation Reform

Act ("PSLRA"); (III) the Initial Complaint did not allege sufficient facts to meet the PSLRA's "scienter" requirement for forward-looking statements; and (IV) Plaintiffs lack standing.

In the 2003 Order, this Court held that the Public Statements were "forward-looking statements" as defined in the PSLRA (15 U.S.C. 78u-5(i)(1)) and that Plaintiffs "allege[d] sufficient facts to show that Defendants omitted material facts which if disclosed would have significantly altered the accuracy of the 2002 financial commitments, and therefore, have sufficiently alleged that the [Public Statements] were misleading and not made in good faith or with a reasonable basis." The Court, however, granted the motion to dismiss after finding that the Public Statements were accompanied by sufficient "cautionary language" and therefore, were protected under the first-prong of the safe harbor provision in the PSLRA (15 U.S.C. 78u-5(c)(1)(A)(i)).

On appeal, the Seventh Circuit agreed with this Court's finding that the Public Statements were forward-looking as defined in the PSLRA. 377 F.3d at 728. Judge Easterbrook, however, held that this Court prematurely concluded that the "cautionary language" accompanying the Public Statements gave sufficient warnings. Id. at 734. Such a determination should not be decided on a motion to dismiss because Plaintiffs were entitled to discovery to determine if Baxter disclosed the "major risks" it "objectively faced" at the time it issued "the forward-looking statements." Id. Accordingly, this case was reversed and remanded.

On remand, Plaintiffs filed the Amended Complaint alleging the same conduct set forth in the Original Complaint. The only substantive difference between the two complaints is that Plaintiffs have now dropped their claim under section 11 of the 1933 Act. Defendants now seek

7

dismissal under the "second prong" of the PSLRA's safe harbor provision.[6]

## STANDARD OF REVIEW

In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court must assume the truth of all facts alleged in the pleadings, construing allegations liberally and viewing them in the light most favorable to the non-moving party. See, e.g., McMath v. City of Gary, 976 F.2d 1026, 1031 (7th Cir. 1992); Gillman v. Burlington N. R.R. Co., 878 F.2d 1020, 1022 (7th Cir. 1989). Dismissal is properly granted only if it is clear that no set of facts which the plaintiff could prove consistent with the pleadings would entitle the plaintiff to relief. Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Kunik v. Racine County, Wis., 946 F.2d 1574, 1579 (7th Cir. 1991) (citing Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)).

The court will accept all well-pled factual allegations in the complaint as true. Miree v. DeKalb County, 433 U.S. 25, 27 n.2 (1977). In addition, the court will construe the complaint liberally and will view the allegations in the light most favorable to the non-moving party. Craigs, Inc. v. General Electric Capital Corp., 12 F.3d 686, 688 (7th Cir. 1993). However, the court is neither bound by the plaintiff's legal characterization of the facts, nor required to ignore

---

[6] To avoid confusion, this Court notes that the PSLRA's safe harbor contains "two independent prongs" – subsection (c)(1)(A) and subsection (c)(1)(B). Southland Sec. Corp. v. Inspire Ins. Solutions, Inc., 365 F.3d 353, 371 (5th Cir. 2004). See also Joint Explanatory Statement of the Committee of Conference, Statement of Managers, H.R. Conf. Rep. No. 104-369, 104th Cong., at 44, 1995 U.S.S.A.N. 730, 743. In Defendants' Motion to Dismiss the Original Complaint, they contended that dismissal was proper under both prongs of the safe harbor. In dismissing the Original Complaint, however, this Court only addressed the application of the first prong. Likewise, on appeal, although Defendants argued dismissal was proper under both prongs, the Seventh Circuit did not discuss the second prong. Accordingly, the instant matter is properly before this Court. See United States v. Morris, 259 F.3d 894, 898 (7th Cir. 2001) (on remand, the district court may address issues raised but not previously decided).

facts set forth in the complaint that undermine the plaintiff's claims. Scott v. O'Grady, 975 F.2d 366, 368 (7th Cir. 1992).[7]

## ANALYSIS

Defendants seek to dismiss the Amended Complaint on the grounds that Plaintiffs have failed to allege facts supporting a "strong inference" that Defendants "had actual knowledge" that the Public Statements were false or misleading, as required by the second-prong of the PSLRA's safe harbor provision (15 U.S.C. § 78u-5(c)(1)(B)(i)). Before discussing the parties' specific contentions, this Court will first address exactly what Plaintiffs must plead to avoid dismissal under the second part of the safe harbor provision.

Under the second prong of the safe harbor, parties "shall not be liable with respect to any forward-looking statement, whether written or oral, if . . . (B) the plaintiff <u>fails to prove</u> that the forward-looking statement . . . was made with actual knowledge . . . that [it] was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B)(i) (emphasis added). In other words, the second prong of the safe harbor "protects forward looking statements if . . . [they] were made without actual knowledge that the statements were false or misleading." In re Lockheed Martain Corp. Sec. Litig., 272 F. Supp. 2d 944, 949 (C.D. Cal. 2003). But see In re AOL Time Warner, Inc. Sec. and ERISA Litig., 2004 WL 992991, at *19 (S.D.N.Y. May 5, 2004) (refusing to apply the second part of the safe harbor where the plaintiff "has adequately alleged that [the public statements] were made with conscious or <u>reckless disregard</u> for the true financial condition of the company") (emphasis added).

Although the language of the second prong requires the plaintiff "to prove," which this

---

[7] In addition to Rule 12(b)(6), this action implicates other legal standards which govern securities fraud cases. The Court will discuss these standards, where applicable, below.

9

Court construes as proving at trial, courts interpreting this provision have held that plaintiffs must allege sufficient facts "to raise a reasonable and strong inference that defendants" had "actual knowledge" of the "false or misleading nature" of the forward-looking statements. See In re Compuware Sec. Litig., 301 F. Supp. 2d 672, 682 (E.D. Mich. 2004). See also In re Seebeyond Tech. Corp. Sec. Litig., 266 F. Supp. 2d 1150, 1163 (C.D. Cal. 2003) (denying a motion to dismiss where plaintiff "made sufficient allegations that the defendants had actual knowledge that the statements in the [] press release were false or misleading"); State of New Jersey v. Sprint, 2004 WL 1960130, at *9 (D. Kan. Sept. 3, 2004) (holding that plaintiffs "properly pled a claim based on [misleading forward-looking] statements" because they were "alleged to have been made with actual knowledge that they were false or misleading"); In re Globalstar Sec. Litig., 2003 WL 22953163, at *8 (S.D.N.Y. Dec. 15, 2003) (denying a motion to dismiss "[b]ecause plaintiffs sufficiently allege[d] that defendants knew their misrepresentations were false when made"); Clark v. TRO Learning, Inc., 1998 WL 292382, at *5 (N.D. Ill. May 20, 1998) (dismissing action under the second prong of the safe harbor because the plaintiff "fail[ed] to allege in the complaint that defendants had actual knowledge of falsity"); 3 Bromberg & Lowenfels, Securities Fraud & Commodities Fraud § 6:36, at 6-109 (2d ed. 2004) (plaintiff must allege that defendant had "actual knowledge" that the public statements were misleading).

To meet this pleading standard, plaintiffs must do more than simply plead "conclusory" allegations that the defendants had "actual knowledge" that the statement was false or misleading. Sprint, 2004 WL 1960130, at *9-10. Instead, applying 15 U.S.C. § 74u(4)(b)(2) and Rule 9(b), courts require that the plaintiff "state with particularity facts giving rise to a

strong inference that the defendant" had "actual knowledge of the falsity of the statements." In re Noven Pharm., Inc. Sec. Litig., 238 F. Supp. 2d 1315, 1322-23 (S.D. Fla. 2002). In determining whether plaintiffs have met this burden, courts examine the totality of the facts, see In re Kinderd Healthcare, Inc. Sec. Litig., 299 F. Supp. 2d 724, 740 (W.D. Ky. 2004), including, whether the defendants: (1) "were in possession of specific information which called into doubt their stated projections," In re Globalstar Sec. Litig., 2003 WL 22953163, at *7 ; (2) had "motive and opportunity" to issue the misleading statements, In re Compuware Sec. Litig., 301 F. Supp. 2d at 688; (3) sold the company's stock "at a suspicious time or in an unusual amount," In re Kinderd Healthcare, Inc. Sec. Litig., 299 F. Supp. 2d at 739-40; and (4) had "access to financial data through sophisticated information technology." Id.

Additionally, although not interpreting the second prong of the safe harbor, at least one court in this district, addressing whether plaintiffs have sufficiently alleged knowledge of misleading statements, held that "high-level [] managers . . . may be presumed to have been aware of [] problems" at their company. Danis v. USN Communications, Inc., 73 F. Supp. 2d 923, 938 (N.D. Ill. 1999). Such a presumption is particularly strong where the specific problem facing the company: (1) affects "a significant source of income" or a "core [business] operation"; or (2) would be "readily recognized by an outsider." Id. at 939. Likewise, although not enough in and of itself to show intent, where the purpose of the statement was to induce another company's shareholders to exchange their shares for those of the defendant company at "an artificially inflated price," courts may consider this fact in its determination of whether "actual knowledge" is properly alleged. See, e.g., Schaps v. McCoy, 2002 WL 126523, at *3 (N.D. Ill. Jan. 31, 2002).

Following the above standards, courts have found that plaintiffs have sufficiently alleged actual knowledge, where the complaint contains allegations that defendants were high level managers, who had access to frequent reports which would lead a reasonable person to believe that the predictions being made in public statements are not accurate and/or missing relevant information. For example, in Globalstar Sec. Litig., 2003 WL 22953163, at *1, the plaintiff shareholders alleged that the individual defendants, who were the company's top officers and managers, "artificially inflated the value of [the company's] stock by making material misstatements and omissions regarding the company's financial prospects" in statements released to the public. The defendant company was in the business of providing satellite phone service. Id. at *2. At the beginning of the class period, the defendants issued a press release announcing "projections" of $300 million in revenue and 600,000 paying customers by the end of the following year. Id. The defendants reiterated these statements several times over the next year. Id. at *2-3. At the end of the year, however, the company announced that it had only 21,300 subscribers and revenues no where near that projected. Id. *4.

The plaintiffs alleged that the defendants "knew" that their projections were misleading because they were based on an assumption that all 38 of the company's satellites would be operating, when in fact the defendants knew that only three were running and the others were "plagued with numerous delays." Id. at *6. According to the plaintiffs, the defendants were "updated on a weekly basis" on these problems and the lack of subscribers. Id. at *7. Nevertheless, the defendants continued to make the unrealistic projections. Id. Based on these allegations, the court, in denying a motion to dismiss, held that "[b]ecause plaintiffs have sufficiently allege[d] that defendants knew their [projections] were false when made, the safe

harbor" was not applicable. Id. at *9.

Similarly, in Compuware Sec. Litig., 301 F. Supp. 2d at 677, the plaintiff shareholders alleged that the individual defendants, who were the company's top officers and managers, "issued a series of misleading [public] statements designed to conceal from the investing public the serious problems which developed" in the defendant company's "business relationship" with IBM. The defendant company was a computer software company whose "majority of [] revenue ... [was] dependent upon" its customers' ability to run the defendant's software on IBM mainframe computers. Id. At the beginning of the class period, the defendants learned that IBM was planning on developing its own software to compete with the defendant and that IBM would no longer give the defendant access to vital technical information. Id. at 677-78. Despite knowing this adverse information, the plaintiffs alleged that the defendants failed to disclose this news in their press releases and public filings. Id. at 678. Instead, the defendants issued unattainable positive predictions projecting future sales growth and improved profitability. Id. at 678-79.

In ruling on a motion to dismiss, the court found that the plaintiffs had pled sufficient facts to "rais[e] a reasonable and strong inference" that the defendants had "actual knowledge" that the public statements were false or misleading, and thus, the second prong was not applicable. Id. at 683. The court made this decision based on all of the alleged facts, including that IBM informed the defendants that it was dissatisfied with its software and was planing on developing a competing product. Id. at 685. Given the importance of this line of business to the defendant company's overall sales, the court noted that its was unreasonable for top management to state that the company's prospects looked promising. Id.

13

Likewise, in Sprint, 2004 WL 1960130, at *9-10, the court found that the plaintiff shareholders had alleged sufficient facts to meet the second prong of the safe harbor. The shareholders alleged that the defendant company issued false and misleading statements stating that two key executives, who had "transformed" the defendant from "a rural phone company to a national carrier," would continue to lead the company. Id. at *3. In fact, however, the two key executives were facing serious financial problems as the result of misusing a tax shelter. Id. These problems were so serious that "it was inevitable, or at a minimum, a material possibility, that the [two executives] would no longer serve" the defendant. Id. at *4.

The defendants' moved to dismiss on the grounds that the "allegations of actual knowledge [were] conclusory and thus, insufficient to withstand a motion to dismiss." Id. at *10. Rejecting this contention, the court held that the plaintiffs alleged that it was known in the company that the two executives faced serious financial problems in the form of tax liabilities, which would probably bankrupt them. Id. Thus, the court found that, particularly "before discovery," these allegations raised a real possibility that the two executives would not be employed in the future, and therefore, "actual knowledge" was properly alleged. Id.

Here, after carefully reviewing the aggregate of the conduct alleged in the Complaint, this Court finds that Plaintiffs have pled sufficient facts to raise a reasonable and strong inference that Defendants had "actual knowledge" that the Public Statements were misleading. This decision is based on Plaintiffs' allegations that: (1) the Individual Defendants had information which called into doubt the Commitments in the Public Statements; (2) nine of the eleven Defendants financially benefitted from the false information by selling off substantial portions of their Baxter stock during the Class period at much higher prices than if the non-

disclosed information had been released; and (3) Baxter was able to acquire Fusion at a much lower cost at the artificially high stock price. The Court will address each of these allegations in turn.

Plaintiffs allege that the Individual Defendants were top managers who had access to the "undisclosed information" which contradicted the rosy picture painted in the Public Statements. According to Plaintiffs, the Individual Defendants were "hands-on managers" and "were directly involved in the day-to-day operations" at Baxter. As "high-level managers," Defendants "routinely accessed . . . Baxter's weekly (and even daily) revenue and financial reports via a computer system known internally at Baxter as the 'enterprise system,' which was a management information system developed by J.D. Edwards." Based on this, Plaintiffs allege that Defendants had possession of "reports of actual operations," which would have shown them that the predictions in the Commitments were unrealistic.

Additionally, Plaintiffs allege that certain of the Defendants by their specific job duties and responsibilities "knew" of the "undisclosed" problems in the Renal and BioSciences Divisions. For example, Plaintiffs allege that Defendant Reidel, Baxter's "Chief Scientific Officer," Defendant Quick, the "Vice President of Quality and Regulatory," and Defendant Gatling, who was head of "Global Manufacturing Operations," "knew about": (1) the severe problems in the Renal Division, including the plant closures and discontinuation of lost cost dialysis products[8]; and (2) the manufacturing problems the BioSciences Division was

---

[8]  Knowledge of problems with the sale of dialysis products would have been particularly telling because the Renal Division's sales accounted for 25% of Baxter's total sales the previous year. Thus, any problems with sales this year would no doubt have been recognized as having a negative effect on Baxter's overall sales numbers. See Danis, 73 F. Supp. 2d at 939 ("Problems readily recognized by an outsider can be presumed to be known to a company's management").

experiencing. Likewise, Plaintiffs allege that Defendant May knew of the plant closings in the Renal Division because, as head of human resources, she "was actively involved in the transferring and firing of the substantial numbers of employees" at the plants which made the low cost dialysis products. Plaintiffs also point to Defendant Beard, who was head of Baxter's European operations and thus, "was aware" of the dialysis deaths and plant closings because many of the deaths and one of the plants which produced the faulty products were located in Europe. Baxter's "General Counsel," Defendant Sabatino, is also alleged to have had knowledge of the dialysis deaths and plant closings based on the legal issues associated with those issues.

To support their allegation of "actual knowledge," Plaintiffs also allege in great detail the sales of stock by nine of the eleven Individual Defendants during the Class Period. During the seven months of the Class Period, nine of the eleven Individual Defendants sold 437,100 shares of Baxter stock, clearing $23,939,516 in total proceeds.[9] As set forth in detail in the chart above, Plaintiffs allege that the these sales represented a dramatic increase when compared to Defendants' trading practices over the previous seven years. Indeed, three Defendants, who had

---

[9] Defendants contend that the stock sales by the nine Individual Defendants are irrelevant because Plaintiffs have failed to allege that any of these nine "participated in any way in the issuance" of the Public Statements. In support of this argument, Defendants assert that the "group pleading doctrine" is not valid under the PSLRA. The "group pleading doctrine . . . allows plaintiffs to rely on the presumption that certain statements of a company, such as financial reports . . . , and press releases, are the collective work" of "high-level" management. In re Spiegel, Inc. Sec. Litig., 2004 WL 1535844, at *20 (N.D. Ill. July 8, 2004). While some courts have held that the PSLRA abolished the group pleading doctrine, the Seventh Circuit has not addressed the issue. Id. at *21. Many district courts in this district, however, have continued to apply the doctrine. Id. Here, until the Seventh Circuit holds otherwise, this Court will continue to apply the group pleading doctrine, and until evidence is presented to the contrary, attribute the Public Statements to all of the Individual Defendants, particularly given that Plaintiffs allege that they are high-level managers who were involved in the day-to-day operations of Baxter during the Class Period.

hardly sold any stock at all during the prior seven years, sold almost seven million dollars in Baxter stock during the Class Period.

Plaintiffs also point to the acquisition of Fusion by Baxter two and a half months before Baxter released its actual financial results. When Baxter announced its purchase of Fusion, on April 30, 2002, its stock was trading at $56.90 a share. According to Plaintiffs, this price was artificially inflated by the inaccurate picture painted in the Public Statements. On the day Baxter released its actual numbers, however, Baxter's stock price fell to $43 a share. Baxter thus was able to complete its acquisition of Fusion at a much lower cost due to the Public Statements.

Accordingly, based on the totality of the allegations and the climate and circumstances surrounding the Public Statements, this Court finds that Plaintiffs have pled sufficient facts to raise a reasonable and strong inference that Defendants had "actual knowledge" that the Public Statements were misleading.[10]

---

[10] In reaching this holding, the Court notes that although the PSLRA substantially raised the pleading standard in securities cases, "courts must be careful not to set the hurdles so high that even meritorious actions cannot survive a motion to dismiss. Such a regime would defeat the remedial goals of the federal securities law." Sutton v. Bernard, 2001 WL 897593, at *5 (N.D. Ill. Aug. 9, 2001). See also Dardick v. Zimmerman, 149 F. Supp. 2d 986, 989 (N.D. Ill. 2001) (in refusing to hold the "group pleading doctrine" void under the PSLRA, Judge Shadur held that exactly what statements each defendant made will be revealed in discovery). Also pertinent to this Court's decision is the Seventh Circuit's holding, in reversing this Court's decision with respect to the first prong of the safe harbor, that "this complaint could not be dismissed under the safe harbor, though we cannot exclude the possibility that if after discovery Baxter establishes that the cautions did reveal what were, *ex ante*, the major risks, the safe harbor may yet carry the day." Asher, 377 F.3d at 734.

## CONCLUSION

For the reasons discussed, this Court DENIES the Baxter Defendants' Motion to Dismiss the Amended Class Action Complaint [53-1].

ENTER:

*Blanche M. Manning*
**BLANCHE M. MANNING**
**U.S. DISTRICT COURT JUDGE**

DATE: 2-3-05