# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| BRIAN ASHER, individually and on behalf of all others similarly situated, )<br>Plaintiff, )<br>)<br>v. )<br>)<br>BAXTER INTERNATIONAL, INC., *et al.* )<br>Defendants. ) | No. 02 CV 5608<br>Hon. Blanche M. Manning |

## MEMORANDUM AND ORDER

On July 18, 2002, the value of shares of Baxter International, Inc. dropped 25% on news that revenues had not met expectations. This suit followed. It began as a proposed class action lawsuit but, following denial of class certification, is now being maintained by just two individuals plaintiffs, Elizabeth Sherry and Tommy Newman. They allege that the dramatic drop in the value of their Baxter shares is the result of securities fraud on the part of the remaining defendants—Baxter, its former CEO Harry Kraemer, and its former CFO Brian Anderson. Baxter, Kramer and Anderson have moved for summary judgment on both counts of the amended complaint, one a claim of securities fraud under § 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 (Count I), and the other a claim against the individual defendants for controlling person liability under § 20(a) of the Exchange Act (Count II). For the reasons that follow, the motion for summary judgment is granted.

## BACKGROUND

The following facts are undisputed except where noted. Actual and projected sales figures do not account for foreign currency fluctuations except where noted.

On October 18, 2001, Baxter issued a press release reporting its financial results for the third-quarter of 2001, its year-to-date results for 2001, and its projections (which it calls financial commitments) for 2002. According to the release, Baxter's year-to-date sales grew 16% and its earnings grew 15% when compared to the same period the year before. Baxter also projected that in 2002 sales would grow in the low teens, earnings per share would grow in the mid-teens, and that Baxter would generate operational cash flow of more than $500 million. During a conference call for investors that same day, Baxter provided sales growth targets for its three business segments: Renal sales were projected to grow in the low double-digits, Medication Delivery sales were projected to grow in the mid-teens, and BioScience sales were also projected to grow in the mid-teens.

Issuing projections for the coming year was standard practice for Baxter. The process began each summer, when executives from Baxter's business segments collaborated to develop first a budget, and then an internal operating plan for the coming year. Defendants Kraemer and Anderson then used the operating plan to develop the full-year sales, earnings and cash flow commitments that Baxter released to the public each October. The publicly-announced commitments were more conservative than the projections in the internal operating plan.

Shortly after releasing its commitments for 2002, Baxter issued a press release on November 5, 2001, announcing the discontinuation of its Althin line of dialyzers, which were being blamed for the deaths of multiple patients in Europe. In the press release, Baxter stated that it did not expect the discontinuation of the Althin dialyzers to impact the financial commitments it had previously announced for 2002.

However, on January 24, 2002, Baxter did indeed change its financial commitments. In a press release issued that day, Baxter announced that it was lowering its sales forecast for the Renal business segment from growth in the low double-digits to growth in the high single-digits. In addition to attributing the reduction to the discontinuation of the Althin line of dialyzers, the press release also attributed the reduction to a slowdown in the acquisition of Renal Therapy Services centers in Latin America and Asia due to unfavorable economic conditions in those regions. Despite the reduced forecast for Renal sales, Baxter reiterated its forecast of sales growth in the mid-teens for the BioScience and Medication Delivery business segments, as well as its commitment to sales growth in the low-teens for Baxter overall.

On January 24, 2002, Baxter also announced its financial results for the fourth quarter of 2001 as well as for the full year of 2001. According to the announcement, Baxter had achieved its full-year commitments. Specifically, it had forecast sales growth in the low double-digits and achieved 15% growth. It was the eighth consecutive year that Baxter had met its annual earnings and cash flow commitments.

Baxter reiterated its financial commitment to overall sales growth two more times during the coming months. On March 13, 2002, Baxter issued its 2001 Annual Report, in which it reiterated that Baxter expected to meet its full-year 2002 commitments of overall sales growth in the low-teens. On April 18, 2002, defendant Kraemer reiterated the commitments again in a press release reporting financial results for the first quarter of 2002. Kraemer announced that, based on first quarter results, Baxter remained on track to meet its full-year 2002 financial commitments of overall sales growth in the low teens.

But the financial news Baxter delivered on July 18, 2002, was not so rosy. Baxter reported that Renal sales had dropped 1% during the second quarter of 2002. Baxter attributed the drop in Renal sales to four primary factors. First, economic volatility in Latin America and Asia had caused Baxter to put on hold its acquisition of any new renal therapy service centers in those regions. Second, former users of the cheaper but now discontinued line of Althin dialyzers had not been switching to Baxter's other, more expensive, dialyzers and Baxter had not developed a cheaper dialyzer to replace the Althin as expected. As a result, users were switching to dialyzers produced by Baxter's competitors. Third, Baxter's problems with the Althin dialyzer had a spillover effect that made some patients reluctant to buy *any* Baxter hemodialysis product. Fourth, economic volatility in foreign markets had negatively affected Baxter's sale of peritoneal dialysis products.

In addition to the drop in Renal sales, Baxter also reported that its BioScience sales during the second quarter of 2002 had also been adversely affected by two factors. First, Baxter's sales of intravenous immonoglobin ("IGIV") had been limited by capacity constraints. Second, late in the second quarter, a number of competitors had unexpectedly slashed the price they charged for albumin, dramatically driving down the market price for Baxter's albumin.

Despite this news, in the July 18, 2002, press release Baxter nevertheless reiterated that it still expected to meet its full-year 2002 commitment to overall sales growth in the low teens. However, the market responded negatively to Baxter's announcement. Shares of Baxter closed at $32 a share that day, a 26.3% decline from the closing price of $43.41 the day before. As a result of that decline, the value of the shares owned by shareholders like plaintiffs Sherry and Newman dropped 26.3%. On July 18, 2002, Newman owned a total of 1,000 shares (R.140 at 2

n.2), so the value of his shares dropped that day by approximately $11,410. Sherry owned a total of 300 shares (*id.*), so the value of her shares dropped that day by approximately $3,423.

On October 3, 2002, Baxter announced that it was lowering its forecast of sales growth for 2002 from the low teens to the low double digits. According to the announcement, Baxter's sales had increased 10% for the full year (compared to its original forecast of growth in the low teens and revised forecast of growth in the low double digits), its earnings per share increased 13% (compared to its forecast of growth in the mid teens) and Baxter generated operational cash flow of $468 million (compared to its forecast of $500 million). BioScience sales had increased 11% (compared to Baxter's forecast of growth in the mid-teens), Medication Delivery sales increased 14% (compared to Baxter's forecast of growth in the mid-teens), while Renal sales increased 2% (compared to Baxter's original forecast of growth in the low double-digits and revised forecast of growth in the high single-digits).

The plaintiffs contend that the defendants knew all along that Baxter's financial commitments had become unattainable, but continued to reaffirm those commitments (with the exception of Renal sales) in order to artificially inflate the value of Baxter shares. As a result, the plaintiffs contend that they overpaid when they purchased their shares[1] between the November 5, 2001, announcement that the Althin line of dialyzers had been discontinued—the point at which Baxter allegedly became aware that its forecasts were unattainable—and when the

---

[1]Newman testified during his deposition that he purchased 900 shares on February 26, 2002, and another 100 shares on June 11, 2002. (R. 140-4, Newman Dep. 30:11 - 32:15, 49:6-18). Sherry testified that she purchased 300 shares on June 10, 2002. (R. 140-3, Sherry Dep. 45:11 - 46:5).

share price plummeted after Baxter's July 18, 2002, announcement that sales had fallen short of expectations.

The plaintiffs filed their original complaint on December 6, 2002, which has been superseded by their amended complaint dated November 23, 2004. In the amended complaint, they have alleged two counts. In Count I, the plaintiffs allege that Baxter, Kraemer and Anderson violated § 10(b) of the Securities Exchange Act and Rule 10b-5 by making material misstatements and omissions of facts in Baxter's SEC filings, press releases, and oral statements to the media. In Count II, they allege that Kraemer and Anderson were control persons under § 20(a) of the Act and therefore are personally liable for the alleged misstatements and omissions of Baxter.

The defendants have moved for summary judgment on both Counts I and II. In support, they argue that the plaintiffs cannot establish securities fraud (Count I) because there is no evidence that (1) Baxter's 2002 projections were false or misleading, (2) that the defendants acted with improper scienter in issuing these projections, or (3) the plummet in the value of Baxter shares was caused by the alleged falsity of Baxter's projections. They further argue that, because the plaintiffs cannot establish securities fraud against Baxter in Count I, they necessarily cannot establish control liability against the individual defendants in Count II.

**ANALYSIS**

**A.      Summary Judgment Standard**

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact." Fed. R. Civ. P. 56(c). The court construes all the facts and

share price plummeted after Baxter's July 18, 2002, announcement that sales had fallen short of expectations.

The plaintiffs filed their original complaint on December 6, 2002, which has been superseded by their amended complaint dated November 23, 2004. In the amended complaint, they have alleged two counts. In Count I, the plaintiffs allege that Baxter, Kraemer and Anderson violated § 10(b) of the Securities Exchange Act and Rule 10b-5 by making material misstatements and omissions of facts in Baxter's SEC filings, press releases, and oral statements to the media. In Count II, they allege that Kraemer and Anderson were control persons under § 20(a) of the Act and therefore are personally liable for the alleged misstatements and omissions of Baxter.

The defendants have moved for summary judgment on both Counts I and II. In support, they argue that the plaintiffs cannot establish securities fraud (Count I) because there is no evidence that (1) Baxter's 2002 projections were false or misleading, (2) that the defendants acted with improper scienter in issuing these projections, or (3) the plummet in the value of Baxter shares was caused by the alleged falsity of Baxter's projections. They further argue that, because the plaintiffs cannot establish securities fraud against Baxter in Count I, they necessarily cannot establish control liability against the individual defendants in Count II.

**ANALYSIS**

**A.      Summary Judgment Standard**

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact." Fed. R. Civ. P. 56(c). The court construes all the facts and

the reasonable inferences drawn from those facts in favor of the non-movant. *See Warren v. Solo Cup Co.*, 516 F.3d 627, 629 (7th Cir. 2008). The nonmoving party, however, may not merely rest upon the allegations or details in her pleadings, but instead, must set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**B.      Securities Fraud Against Baxter, Kraemer and Anderson (Count I)**

To prevail on a claim of securities fraud under § 10(b) of the Securities and Exchange Act and SEC Rule 10b-5, a plaintiff must establish each of the following elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008). When the statement at issue is a forward-looking statement (which the parties agree is the case here), a plaintiff succeeds in establishing that the statement contains a material misrepresentation or omission only by showing that it was not made in good faith or that it was made without a reasonable basis in fact. *See Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1333 (7th Cir. 1995).

**1.      Good Faith or Reasonable Basis in Fact**

The defendants contend that plaintiffs Sherry and Newman have failed to identify any evidence that Baxter's forward-looking financial projections lacked either good faith or a reasonable basis in fact. In response, the plaintiffs have identified evidence such as internal e-mails and deposition testimony which they contend demonstrate that, each time Baxter reaffirmed its financial commitments between November 5, 2001, and April 18, 2002, the defendants knew that the commitments had become unattainable. The plaintiffs contend that

their evidence creates a disputed question of fact over whether the defendants acted without good faith or a reasonable basis in fact. The court will limit its review to those pieces of evidence identified in the plaintiffs' response brief. *See Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 722 (7th Cir. 2008) ("Judges are not like pigs, hunting for truffles buried in the record.") (internal quotation marks and citation omitted). Likewise, the court will consider only what could have been known by the defendants at the time they reaffirmed Baxter's projections. *See In re Healthcare Compare Corp. Sec. Litig.*, 75 F.3d 276, 281 (7th Cir. 1996) (later events showing that a different projection would have been more reasonable do not establish that the actual projection constituted securities fraud).

        **a.**        **Announcement that Althin Dialyers Had Been Discontinued (November 5, 2001)**

On November 5, 2001, Baxter announced that it was discontinuing its Althin line of dialyzers in the wake of multiple deaths attributed to the dialyzers. At the time, Baxter announced that it did not expect its financial commitments announced on October 18, 2001, to be impacted by its decision to discontinue the Althin line of dialyzers. The plaintiffs contend that when Baxter reaffirmed its financial commitments despite the news about the Althin dialyzers, they lacked good faith and acted without a reasonable basis in fact because, at that point, they knew that the commitments were unattainable. They identify the following evidence as support for their contention that the commitments had become unattainable: (1) Baxter assumed it would lose only $20 million as a result of pulling the Althin dialyzers, a number that the plaintiffs assert was unreasonably low, (2) a memorandum from one Baxter employee to another referred to a budget gap and questioned the productiveness of Baxter's renal therapy service centers, and (3)

an internal report projected that the worldwide market for albumin would drop between 2001 and 2010. The court addresses the plaintiffs' proffered evidence in turn.

### i. Anticipated Losses from Althin Dialyzers

First, the plaintiffs contend that the defendants lacked good faith and acted without a reasonable basis in fact when they failed to lower Baxter's 2002 financial projections as a result of discontinuing the Althin dialyzers. According to the defendants, no adjustment was necessary because Baxter had anticipated selling only $20 million of Althin dialyzers during 2002. Thus, Althin sales would have accounted for only .2% of Baxter's total projected sales of $8.898 billion, and therefore even the total loss of those sales would have had no more than an insignificant effect on Baxter's projections.

The plaintiffs' response is as follows: "it is manifest that lost sales caused by the removal of a product from commerce, especially when paired with the public backlash sure to coincide with such a hideous event, will far exceed $20 million." (Response, R. 302, at 11 n.5.) That response is wholly conclusory. The plaintiffs have failed to identify any evidence that a backlash was "sure to coincide," that any backlash would have cost Baxter more than just the lost sales of Althin dialyzers, that the defendants ignored evidence of a backlash. To the contrary, while Kraemer first wondered in late 2001 whether there would be a backlash, it was not until late in the second quarter of 2002 that Alan Heller, president of Baxter's Renal segment, first noticed an adverse impact on the sales of Baxter's other hemodialysis products. *See* Deposition of Alan Heller, Defendants' Exhibits (R.301), Tab 12 at 33:5 - 13. Moreover, the plaintiffs have identified no evidence that Baxter's reaffirmation of its projections had not already taken into account the effects of any anticipated backlash. As a consequence, the plaintiffs' conclusory

response is insufficient to prevent summary judgment. *See Obriecht v. Raemisch*, 517 F.3d 489, 493 (7th Cir. 2008) (conclusory arguments in response brief unsupported by admissible evidence are insufficient to prevent summary judgment).

### ii. Renal Services E-Mail

Next, the plaintiffs cite to a memorandum from Sally Benjamin Young to Sharon Alterio dated September 7, 2001. Although the memorandum is 3 pages long, the plaintiffs rely on only the following passage:

> Given the size of the budget gap, I have to ask the question: does this business add enough value to Renal to make it worth continuing? Could we add more value to our business (and Baxter overall) by investing in something else with less risk? The trade-off question here is whether it makes sense to miss the target in RTS vs. spending to grow PD. I'd want a much clearer picture of the dollars associated with product pull-through—still not sure what it is in quantifiable terms (unless I missed it when stepping out of the room).

(Plaintiffs' Exhibits, R. 308, Ex. 17 at 1.)

The plaintiffs contend that, based upon that passage, the defendants "were well aware of the turmoil surrounding the Renal [therapy] service centers." According to the plaintiffs, because income from the renal treatment service centers was going to "miss the target" and create a "budget gap," the memorandum left the defendants with "little doubt that there were from the start severe misgivings about Baxter's ability to live up to the commitments and related projections." (Plaintiffs' Response, R. 302 at 11.)

For several reasons, the quoted passage is not evidence that the defendants knew that Baxter's projections had become unattainable. First, the plaintiffs have not authenticated the memorandum. Evidence submitted in support of or in opposition to a motion for summary judgment must be admissible at trial under the Federal Rules of Evidence. *See Woods v. City of*

*Chicago*, 234 F.3d 979, 988 (7th Cir. 2000). Among the requirements of the Rules of Evidence is that the document be authentic. *See* Fed. R. Evid. 901(a).

Authentication does not erect a particularly high hurdle to admissibility, and is "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." *Id.*; *see also Bledsoe v. Potter,* 03 CV 3890, 2005 WL 2230188, at *2 n.1 (N.D. Ill. Sept. 7, 2005). "The party offering the evidence is not required to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." *Boim v. Quranic Literary Inst.*, 340 F. Supp. 2d 885, 915 (N.D. Ill. 2004) (citation omitted). "Normally, to demonstrate such trustworthiness and reliability at the summary judgment stage, the party seeking to offer the business record must attach an affidavit sworn to by a person who would be qualified to introduce the record as evidence at trial, for example, a custodian or anyone qualified to speak from personal knowledge that the documents were admissible business records." *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000); *see also Martz v. Union Labor Life Ins. Co.*, 757 F.2d 135, 138 (7th Cir.1985) ("When a party seeks to offer evidence through other exhibits, they must be identified by affidavit or otherwise made admissible in evidence.").

The plaintiffs have offered no affidavits or any other evidence establishing the authenticity of the Young memorandum. Although it appears to be a business record, the plaintiffs have not authenticated it as such and, accordingly, it is inadmissible.

Second, and in a related vein, the plaintiffs have not established that the defendants or anyone else involved in assembling Baxter's 2002 projections ever saw the memorandum or knew its contents. Indeed, the plaintiffs have failed even to identify the positions within Baxter

that the memorandum's sender and recipient held at the time. Without knowing their job titles, it is not possible to infer that the defendants were aware of the memorandum or that the concerns expressed within it were relayed to them.

Finally, although the memorandum mentions a "budget gap" and expresses concern over whether Baxter will "miss the target in RTS," it does not establish that the defendants failed to take these alleged problems into account when assembling the 2002 projections. Moreover, the plaintiffs offer only generalities, such as their argument that the memorandum demonstrates that Baxter was experiencing "significant difficulties." Without evidence quantifying these alleged difficulties, the plaintiffs cannot establish that these difficulties were significant enough to impact Baxter's projections, let alone that the defendants ignored the impact.

In short, the memorandum offers no insight into what the defendants knew or did not know when they reaffirmed Baxter's 2002 financial projections. Accordingly, the plaintiffs' assertion that the defendants were "well aware" of the information communicated in the memorandum is unsupported, and the memorandum is not evidence that the defendants' projections lacked good faith or a reasonable basis in fact.

### iii. Albumin Market Reports

In addition to the alleged financial difficulties with Baxter's renal therapy service centers, the plaintiffs contend that the defendants were aware of impending trouble with another source of Baxter's revenue, the sales of albumin. In support, the plaintiffs cite an internal report dated November 7, 2001, in which Baxter projected a drop in worldwide albumin sales. According to the plaintiffs, the report documents "turbulence in the albumin trade" and is therefore evidence that the defendants knew Baxter's overall sales projections had become unattainable.

The plaintiffs' reliance on the November 7, 2001, report is unavailing for two reasons. First, as with the renal treatment center memorandum, the albumin report is unauthenticated. *See Martz*, 757 F.2d at 138 (to be admissible, documents must be authenticated by affidavit or otherwise).

Second, the albumin report projects changes more modest than the "turbulence" portrayed by the plaintiffs. For instance, the report projects that albumin sales would decline just 1.69% per year over the coming ten years. The plaintiffs have failed to identify any evidence that such modest declines in just one of many components of Baxter's overall sales would impact its sales projections. Without evidence quantifying the impact, once again the plaintiffs have failed to establish any impact on Baxter's projections or that the defendants ignored the impact.

        **c.**        **Announcement of 2001 Year-End Results (January 24, 2002) and Issuance of 2001 Annual Report (March 13, 2002)**

On January 24, 2002, Baxter announced that for the year 2001, it had met its financial commitments of overall sales growth in the low double-digits, earnings per share growth in the mid-teens, and cash flow of $500 million, even though it had discontinued its Althin line of dialyzers in November. It also announced that for year 2002, it was lowering its forecasted sales growth for its Renal division to the high single digits (from the low double digits originally projected on October 18, 2001). But according to Baxter, the expected dip in sales in the Renal segment would not adversely affect its ability to meet any of its other 2002 commitments, including its commitment to achieve overall sales growth in the low-teens.

The plaintiffs contend that Baxter lacked good faith or a reasonable basis in fact when it announced on January 24, 2002, and again on March 13, 2002, that it still expected to achieve

overall sales growth in the low-teens, given the following: (1) Baxter underestimated the loss attributable to the discontinuation of its Althin line of dialyzers; (2) an internal report on the financial performance of the Renal division revealed that sales were $12 million under budget; (3) an internal report on worldwide albumin sales dated January 14, 2002 projected a decline in sales (similar to the albumin report detailed above dated November 7, 2001); (4) the Sally Young memorandum discussed above that questioned whether Baxter's renal therapy service centers were productive enough; (5) deposition testimony that Baxter had considered selling the renal therapy service centers "as early as 2001." The plaintiffs also argue that Baxter lacked good faith or a reasonable basis in fact to announce in its January 24, 2002, news release that it expected "continued growth in its services businesses" in light of the concerns detailed above about the renal treatment service centers.

Again, the plaintiffs have failed to establish the admissibility of much of the evidence upon which they rely and, as a consequence, the evidence cannot help them stave off summary judgment. Specifically, the plaintiffs have not established the authenticity of the Young memorandum, the January 14, 2002, albumin report, or the internal financial report detailing a $12 million deficit in Renal division sales. *See Martz*, 757 F.2d at 138 (to be admissible, documents must be authenticated by affidavit or otherwise).

Even setting aside the evidentiary shortcomings, none of the cited evidence supports the plaintiffs' assertion that Baxter's revised projections lacked good faith or a reasonable basis in fact. As detailed above, the plaintiffs' evidence does not establish that the defendants were aware of the concerns Young expressed in her memorandum, or that their projections failed to take into account those the concerns. Also as detailed above, the plaintiffs have failed to

establish that the defendants knew the concerns about the drop in albumin sales expressed in the second albumin report, or that the defendants' projections failed to take into account the anticipated drop in sales.

As for the internal report that Renal sales had fallen $12 million below budget, the plaintiffs argue that in light of that budget gap, the defendants "badly misrepresented the situation at Baxter" by continuing to project growth in Renal sales for the year. (Response, R. 302, at 15.) But along with announcing the $12 million budget gap, the defendants also lowered projected growth in Renal sales from the low double-digits to the high single-digits. The plaintiffs have identified no evidence that the lower projected growth did not fully account for the $12 million budget gap. To survive summary judgment, a party must identify admissible evidence to support their contentions. Conclusory statements such as "badly misrepresented" do not meet that burden of production. *See Obriecht*, 517 F.3d at 493. Moreover, the gap that the plaintiffs have identified is between actual sales and forecasts contained in an internal Baxter budget never released to the public. The fact that Baxter knew it was falling short of internal forecasts sheds no light on Baxter's ability to meet the projections released to the public, which all agree were more conservative than Baxter's internal budget.

Likewise, the plaintiffs' argument that the defendants underestimated the losses attributable to the discontinuation of the Althin line of dialyzers is unsupported. As detailed above, when Baxter reaffirmed its projections in November 2001, it had already taken into account that none of the $20 million in sales of Althin dialyzers during 2002 would be realized. And it was not until late in the second quarter of 2002 that Baxter realized that discontinuing the

Althin diazlyers had adversely impacted sales of its other hemodialysis products[2]. Moreover, Baxter revised downward its projected sales growth for its Renal segment. With nothing to refute the defendants' evidence, the plaintiffs' argument that the defendants did not fully account for the shortfalls in its Renal segment is unavailing.

Finally, the plaintiffs also contend that the defendants lacked good faith or a reasonable basis in fact to announce in their January 24, 2002, news release that the Renal segment still anticipated "continued growth in its services businesses" when, in fact, Baxter had contemplated selling its renal therapy service centers in 2001. The plaintiffs' argument is not persuasive for two primary reasons. First, although Heller did testify that the Renal segment (of which he was president) had "talked about selling the RTS centers as early as 2001," he does not reveal what led to such discussions or why they were ultimately abandoned. Accordingly, the testimony does not support the plaintiffs' contention that Baxter contemplated selling the service centers in 2001 because the centers were dragging down sales growth. Second, the January 24, 2002, news release refers to growth in the Renal segment's "services business*es*." Plaintiffs' Response (R.302) at 14 (emphasis added). Because the release addressed multiple service businesses within the Renal segment, it does not follow that alleged difficulties with one business make a projection of overall growth unreasonable.

---

[2] Plaintiffs cited an internal financial report showing that during the 4th quarter of 2001, Baxter's Renal segment sales fell below what had been forecast. (Plaintiffs' Exhibits, R.308, Ex. 36 at BAXH0071186.) According to the plaintiffs, this report is evidence that the discontinuation of the Althin dialyzers had a spillover effect and had adversely affected the sales of Baxter's other hemodialysis products. But nothing in the report attributes the lower-than expected sales to a spillover effect. Moreover, sales were down in each of Renal's five business segments, not just in the segment responsible for Baxter's hemodialysis products. Accordingly, the plaintiffs' contention that a spillover effect was responsible for the the lower-than-expected sales is sheer conjecture.

### d.  Announcement of First-Quarter 2002 Results (April 18, 2002)

On April 18, 2002, Baxter announced its first-quarter results for 2002.  According to the announcement sales had risen across the board.  Specifically, compared to the first-quarter of the previous year, overall sales grew 14% while BioScience sales grew 18%, Medication Delivery sales grew 10% and Renal sales grew 2%.  In the announcement, Baxter also reaffirmed its 2002 commitment to overall sales growth in the low-teens, earnings per share growth in the mid-teens, and operation cash flow of at least $500 million.

Despite the reported growth, plaintiffs nevertheless contend that Baxter's reassurance that it was on track to fulfill its commitments lacked good faith or a reasonable basis in fact given the following:  (1) just 11 days earlier, the head of the Renal segment's finance group sent an e-mail to segment president Heller alerting him to a "major problem" achieving Renal's budget, (2) a report prepared on Baxter's Japanese operations refers to the albumin market as "shrinking," and (3) various internal financial reports for the first quarter of 2002 indicated that sales within the Renal segment were falling short of initial expectations, for instance, dialyzer sales had fallen 15.7% compared to the first quarter of 2001.

The proffered evidence does not allow the plaintiffs to survive summary judgment for multiple reasons.  First, as with the other reports attached as exhibits to the plaintiffs' response brief, the plaintiffs have offered nothing to authenticate the reports and they are, therefore inadmissible.  *See Martz*, 757 F.2d at 138. Second, the plaintiffs merely mention that the reports exist.  They offer no explanation of why the information in the reports contradicts Baxter's financial commitments.  The mere fact that sales were falling short of initial expectations is not evidence that Baxter's commitments lacked good faith or a reasonable basis in fact—especially

given that Baxter revised downward its commitment of growth in its Renal segment. Third, the plaintiffs also fail to identify any evidence that the defendants knew about these reports but ignored them.

In summary, the plaintiffs have identified an abundance of evidence in their effort to raise a genuine issue of material fact in the hopes of defeating the motion for summary judgment. Although the court has gone into great detail analyzing why this evidence fails to meet the plaintiffs' burden of production, the analysis boils down to this: the financial reports and other documents and testimony cited simply do not establish that the defendants ignored relevant information when reaffirming and revising Baxter's financial commitments. Moreover, the commitments were in line with previous years' commitments, which Baxter had met for eight straight years. Although the plaintiffs have identified financial challenges that Baxter faced during 2002, the mere existence of financial challenges does not establish that sales growth is unachievable.

### 2.     Scienter & Loss Causation

Because the plaintiffs have identified no evidence that the defendants lacked good faith or a reasonable basis in fact when reaffirming or revising Baxter's 2002 financial commitments, they cannot establish each of the elements necessary to sustain a claim of securities fraud under § 10(b) of the Securities Exchange Act of 1934. Accordingly, the court has no occasion to determine whether the plaintiffs' proffered evidence also establishes other necessary elements, such as scienter or loss causation.

Accordingly, the defendants are entitled to summary judgment on Count I, and the motion for summary judgment on that count is granted.

B.   **Control Person Liability (Count II)**

The defendants also seek summary judgment on Count II, in which the plaintiffs allege that the individual defendants are "controlling persons" of Baxter. Under § 20(a) of the Securities Act, "[e]very person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person."

However, to prevail under § 20(a), a plaintiff must first successfully establish a primary violation of securities laws. *See Pugh*, 521 F.3d at 693. Because the court has already determined that the defendants are entitled to summary judgment on the plaintiffs' primary claim under § 10(b) and Rule 10b-5, they cannot establish a claim of controlling persons liability under § 20(a) against the individual defendants. Accordingly, the individual defendants are also entitled to summary judgment on Count II, and their motion for summary judgment on that count is granted.

## CONCLUSION

For the reasons stated, the defendants' motion for summary judgment [298-1] is granted. The clerk is directed to enter a Rule 58 judgment and to terminate this case from the court's docket.

ENTER:

DATE: February 4, 2009

*Blanche M. Manning*
Blanche M. Manning
United States District Judge